**SIGNED THIS: June 7, 2022**

_____
**Mary P. Gorman**
**United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No.    20-71283 |
| RYAN LOUIS, | ) | |
| | ) | Chapter 11 Subchapter V |
| Debtor. | ) | |

## O P I N I O N

Before the Court are fee applications filed by the Debtor's attorney and the Subchapter V trustee. Because both the Debtor's attorney and the Subchapter V trustee fell short of the Court's expectations for competency, their conduct and fee requests will be discussed at some length. But because both applicants have reduced their fees and the United States Trustee has neither objected to nor commented on the fee requests, both applications will be allowed despite the Court's reservations.

## I.      Factual and Procedural Background

Ryan Louis ("Debtor") commenced this case by filing a voluntary petition under Chapter 13 of the Bankruptcy Code on December 3, 2020. It was his second Chapter 13 case; his first Chapter 13 case, filed August 31, 2020, was dismissed on November 24, 2020, because his scheduled debts exceeded the statutory debt limits, making him ineligible for relief under Chapter 13.[1] The Debtor was represented in both filings by Attorney Joseph Pioletti.

Nearly two weeks into this case, the Debtor filed a motion to extend the automatic stay, asserting that he had liquidated certain collateral since his first case was dismissed and was now within the Chapter 13 debt limits. The motion further asserted that the case was filed in good faith, noting that an issue raised in the prior case regarding his failure to file tax returns was no longer an issue because "all returns have now been filed." The Debtor also filed his statement of financial affairs, the required schedules, a disclosure of attorney compensation, a statement of current monthly income, and a Chapter 13 plan several weeks after the case was commenced.

The schedules disclosed the Debtor's interest in his principal residence subject to a mortgage debt in favor of Bank and Trust Company, ownership of a TD Ameritrade account subject to a lien of First Federal Savings Bank of Champaign-Urbana ("First Federal Savings Bank"), and his interest in several businesses. He identified himself as the sole owner of HRL Properties &

---

[1] The Debtor scheduled nearly $2 million in secured debt, more than half of which he described as being undersecured, and close to $350,000 in other unsecured debt. Claims filed in the case exceeded $2 million. Thus, no matter how the debt was allocated, the Debtor necessarily exceeded the $419,275 unsecured and/or $1,257,850 secured debt limits applicable at the time his first case was filed. *See* 11 U.S.C. §109(e).

Management LLC, valuing his interest at $520,000 and listing numerous encumbered properties owned by the entity. He listed a 50% ownership stake in Grow Properties LLC along with the properties and respective debt obligations in the entity's portfolio, valuing his interest at $70,000. First Bankers Trust Company and West Central Bank were scheduled as creditors having claims secured by properties owned by HRL Properties and Grow Properties. The Debtor also disclosed ownership of Louis Trucking LLC, which he valued at $20,000 and identified as his sole source of income—roughly $8500 per month. The schedules reflected secured debt totaling approximately $1.17 million, nearly $300,000 of which the Debtor categorized as actually undersecured, and other unsecured debts totaling approximately $264,000.[2] The disclosure of attorney compensation filed with the Debtor's schedules said that Attorney Pioletti had agreed to accept $4250 as compensation, with the full balance outstanding.

First Bankers Trust Company objected to the motion to extend the automatic stay, at least to the extent that it might impact its right to proceed with a foreclosure sale of property owned by HRL Properties and located in Riverton, Illinois. The objection alleged that the Debtor, who guaranteed the commercial debt of HRL Properties secured by the real estate, did not have an ownership interest in the specific property. West Central Bank also objected to the motion to extend stay, similarly to the extent that extension of the stay would impair its rights to proceed with its prepetition foreclosure action

---

[2] The same statutory debt limits that applied in the Debtor's first case were applicable in his second case.

involving several properties located in Springfield, Illinois, and owned by either Grow Properties or HRL Properties. The Debtor was alleged to be the guarantor or maker of the notes secured by the real estate but to have no ownership interest in the specific properties.

The Chapter 13 Trustee filed a response to the motion to extend stay, questioning the Debtor's good faith in filing the second case as it appeared that, when accounting for both general unsecured debts and the unsecured portions of secured debts, the Debtor's unsecured debt still exceeded the statutory limits. The Debtor then filed a motion to convert his pending Chapter 13 case to Chapter 11 Subchapter V, as well as a response to the objections to his motion to extend the automatic stay contending that he did, in fact, have an interest in the real estate referenced in the objections because he was the sole member of HRL Properties and a 50% shareholder of Grow Properties. The Debtor also defended his filing of the second Chapter 13 case, citing the complex nature of how his debts were structured and his efforts in liquidating collateral between filings.

At a hearing on the Debtor's motion to extend stay, Attorney Pioletti conceded that the automatic stay, if extended, would not stay actions against properties owned by entities other than the Debtor. He also admitted that, due to the manner in which the debts were scheduled, the unsecured portions of secured debt appeared to put the Debtor over the debt limits. But he maintained that the issue was complicated and that there was an argument to be made that the Debtor was within the debt limits. Attorney Pioletti offered

that, because of the way he was required to enter information into his bankruptcy software, some portions of debts that were cross-collateralized by multiple properties may have been double counted. He did not explain why, if that was the case, he had not created and filed a separate spreadsheet to more accurately identify the assets and debts of the Debtor. The attorney for the Chapter 13 Trustee disagreed that the Debtor was even arguably within the debt limits but said he would not oppose extension of the automatic stay subject to the case being converted to Chapter 11. The Court cautioned that the Debtor might not fare much better in a converted case, noting the increased expenses of Chapter 11 and its own reservations about the Debtor's ability to fund the venture, but asked Attorney Pioletti whether he would be satisfied with the limited extension of the stay proposed by the attorney for the Chapter 13 Trustee. Attorney Pioletti said that such limited relief would be acceptable and that the Debtor intended to proceed with conversion. An order partially granting the motion to extend stay was accordingly entered, and the Debtor's motion to convert was noticed for objections.

On January 22, 2021, in the absence of objection, the Debtor's Chapter 13 case was converted to a case under Chapter 11 Subchapter V. Attorney Sumner Bourne was appointed Subchapter V Trustee in the converted case. Trustee Bourne filed a verified statement of disinterest in which he also stated his acceptance of the appointment and intent to seek compensation at an hourly rate of $250. The Debtor filed an application to employ Attorney Pioletti to represent him, also at an hourly rate of $250. At a hearing held March 9,

2021, on the application to employ, Attorney Pioletti acknowledged that he had not handled a Chapter 11 case before and the Court reiterated its concerns about the Debtor's financial standing, noting the absence of a retainer paid to Attorney Pioletti and the likelihood that additional professionals would need to be hired and paid to help with financial reporting. Still, the application to employ was allowed subject to further Court approval for any compensation ultimately sought.

In accordance with the provisions of Chapter 11 Subchapter V, an order was entered setting an initial 60-day case status conference, a claims bar date, and other deadlines for the Debtor to file statutorily-required documents. Per the order, the Debtor filed a copy of his 2019 federal income tax return, as well as several documents stating that he did not have a cash flow statement, balance sheet, or statement of operations to provide. In anticipation of the status conference, the Debtor also filed his status report stating that he was in the process of obtaining a valuation of his primary residence and negotiating the retention of several pieces of real estate with a secured creditor and that he was optimistic that a confirmable plan would be filed "pursuant to §1181(b)."[3]

The initial status conference was held March 23, 2021, as scheduled. The Court noted the Debtor's "bare-bones" status report and asked Attorney Pioletti if he had anything to add. He said that the Debtor was in the process of compiling documents and preparing financial statements for the United States

---

[3] Section 1181 recites which provisions of Chapter 11 do not apply in Subchapter V cases. It does not provide for the filing or confirmation of a plan. Rather, §1191 deals with confirmation of a plan filed under Subchapter V. As will be explained elsewhere, it appears that Attorney Pioletti copied the report from another case without checking the accuracy of the citations contained therein.

Trustee ("UST") and that he had filed an application to employ a bookkeeper to assist with such tasks. He said that the Debtor was making good progress and still hoped to file a confirmable plan by the deadline, but he admittedly did not have any specifics to report. When asked for input, Trustee Bourne said that he did not have anything to add and that he was just waiting for the filing deadline for the plan; he did not suggest that he was working with the Debtor or creditors to facilitate the formation of a plan that could be consensually confirmed.

The attorney for the UST, however, expressed concern about the progress of the case and the approaching plan deadline. He noted that, while helpful, the application to employ a bookkeeper was only recently filed, and it appeared that little else had been done in the two months since the case was converted. The first two monthly operating reports had yet to be filed, and the UST was also awaiting some other documentation requested from the Debtor. In addition to the standard monthly operating reports, he specifically mentioned the Debtor's duty to file related-entity reports pursuant to Bankruptcy Rule 2015.3. The Court echoed the concerns raised by the UST's attorney, also noting that the Debtor's status report mentioned obtaining a valuation of real estate, yet no application to employ an appraiser had been filed. The Court noted some potential complications from the nature of the Debtor's overlapping business interests and debts and specifically mentioned that the Debtor had said on his Chapter 13 schedules that he individually owned a number of parcels of real estate but had since reported on his Chapter 11 documents that

most of the real estate was owned by other entities. The Court also noted that the co-owners of the entities owning the real estate were in a pending Chapter 7 case, complicating any attempt to deal with those entities or the property owned thereby in this case.[4] Attorney Pioletti and the Debtor were admonished that there was quite a bit of progress that needed to be made if they expected to propose and confirm a plan.

Following the status conference, orders were entered granting previously-filed motions to sell the assets in the Debtor's TD Ameritrade account for the purpose of liquidating the collateral of First Federal Savings Bank and to make adequate protection payments to Bank and Trust Company on the note and mortgage securing the Debtor's primary residence. On April 8, 2021, the Debtor filed an application to employ a real estate evaluator. And, on April 13, 2021, the Court entered an order granting the Debtor's application to employ a bookkeeper. The Debtor filed his Chapter 11 Subchapter V plan on the April 22 deadline.

The proposed plan generally provided for the maintenance of monthly payments on the mortgage debt secured by the Debtor's principal residence, deferred payment of priority tax claims in full, without interest, over the five-year plan term, as well as payment of other secured debts of the Debtor and those of the various business entities under his control that he had personally guaranteed. With respect to income tax claims, the plan first provided that the

---

[4] The co-owners and co-debtors are Michael and Kara Verchota. The Verchotas, also represented by Attorney Pioletti, first filed a Chapter 7 case (#20-90709) on August 14, 2020. That case was dismissed for failure to comply with court orders regarding the filing of required documents. The Verchotas, again represented by Attorney Pioletti, filed a second Chapter 7 case (# 20-90799) on September 29, 2020, which remains pending.

priority taxes would not be put into a class of claims but then elsewhere put the priority taxes into a separate class identified as being impaired and provided for their payment through the plan by the Trustee. With respect to all but one part of the West Central Bank claim and all of the First Bankers Trust Company claim, the plan provided that the claims would be paid directly by the title holders to the real estate securing the claims. The Debtor proposed to commit all of his disposable income to the payment of unsecured claims but projected that the dividend to unsecured creditors would be 0%.

The plan asserted that nonconsensual confirmation was being sought and that the Debtor would therefore not seek to ballot the plan. No disclosure statement was included, and the plan specifically stated that a disclosure statement would not be prepared unless ordered by the Court. Despite several references to exhibits described as the Debtor's liquidation analysis, projections of cash flow and disposable income, and a proposed amortization schedule, no exhibits were attached to or filed in connection with the plan. Due to the lack of required exhibits and other obvious defects in the plan, the Court set a status hearing on the plan instead of entering its standard scheduling order.

Prior to the hearing, the UST filed an objection to confirmation of the plan based on the lack of financial information included with the plan, citing the Debtor's decision not to prepare a disclosure statement and his failure to include the documents referenced as exhibits to the plan. In addition, the UST pointed out that the Debtor had yet to file any monthly operating reports,

making it impossible to determine the Debtor's financial condition and whether the plan was fair and equitable.

At the hearing, the Court agreed with the UST's objection and explained that the complete lack of any meaningful financial information provided in the case made the plan wholly defective. Further, the Court noted that, per the claims filed by the Internal Revenue Service ("IRS") and the Illinois Department of Revenue ("IDOR"), it appeared that the Debtor had not filed tax returns for several tax years.[5] Under the circumstances, the Court explained that there was no way the plan could be confirmed and was therefore reluctant to even process the document.

Attorney Pioletti said that he had hoped to file the referenced attachments shortly after filing the plan but also conceded that, apparently due to some last-minute adjustments and a lack of help from the recently-employed bookkeeper, the documents were still not ready for filing. He also said that the monthly operating reports were "basically" ready to be filed and that the Debtor had filed his outstanding tax returns with the exception of the 2020 returns. Pressed on whether he had the financial information to show that the Debtor would be able to fund his plan, Attorney Pioletti said that the Debtor had prepared a six-month cash flow projection, qualifying his response by noting that the Debtor's property management and rental businesses had essentially no cash flow and that his trucking business, which he expected to fund the

---

[5] The IRS filed a claim on January 11, 2021, for $38,801.84, identifying $23,682.87 of that amount as a priority claim. Taxes due for 2017, 2018, and 2019 were described as estimates because returns had not been filed. IDOR filed a claim on March 16, 2021, for $2084.43, asserting that $1883.67 was entitled to priority. IDOR also reported that returns for 2018 and 2019 had not been filed and that amounts due for those years were "Unknown."

plan, was a new venture with very little financial history to rely on. Complicating matters, when asked how soon he could get the plan attachments filed, Attorney Pioletti admitted that could not suggest a date with any certainty because the Debtor was scheduled to receive a heart and kidney transplant in the near future.

As to the Debtor's assertion in the plan that he did not intend to send ballots for voting because he would be seeking confirmation under the cramdown provisions of §1191(b), Attorney Pioletti provided no explanation or rationale for the decision. The Court acknowledged that Subchapter V case law was developing but expressed concern about why the Debtor would not at least try to obtain consensual confirmation before resorting to nonconsensual cramdown. The Court also noted that the initial status report filed by the Debtor suggested that no efforts were made to obtain a consensus among creditors and appeared to be copied from a report Trustee Bourne had filed on behalf of a debtor he represented in a different case, begging the question of whether the time and attention necessary to secure confirmation was being put forth.[6] The Court also expressed concern that the Debtor had filed an incomplete plan, lacking required information and exhibits, in an effort to

---

[6] Because of its concern about the lack of effort being made in the case to obtain consensual confirmation, the Court undertook a review of other Chapter 11 Subchapter V cases filed in the District, including cases assigned to another judge. The Court was curious about how the Subchapter V practice was developing and what information attorneys were providing in their 60-day status reports. As part of that review, the Court happened upon the case of *Midwest M&D Servs., Inc.* (#20-81102), a case in which Trustee Bourne represented the debtor. The 60-day status report filed there was equally as bare-bones as the report filed in this case and contained the same reference to §1181(b) instead of §1191(b), causing the Court to conclude that Attorney Pioletti had copied from Trustee Bourne. To be clear, there is nothing wrong with an attorney looking at documents filed by other attorneys in similar cases to get an idea of how documents should be drafted. The problem for Attorney Pioletti was in copying the citation to §1181(b) without looking it up and realizing that it was an error. This Court has suggested several times that the document filed herein was copied; neither Attorney Pioletti nor Trustee Bourne have denied that suggestion.

appear to have met the statutory deadline. The Court explained that it could have stricken the incomplete plan, thereby putting the Debtor in the position of having to seek an extension of time to file a plan based on excusable neglect. Although the plan was not stricken, the Court questioned whether the Debtor had really met his statutory deadline. Nevertheless, the matter was set for a further status hearing on May 20, 2021, to see what progress could be made and with the express expectation that, before that date, the Debtor would prepare and file or otherwise provide all necessary financial information to satisfy confirmation standards.

The day before the continued hearing date, the Debtor filed several documents. He filed objections to the tax claims of the IRS and IDOR, asserting that all returns had been filed. The Debtor also filed three exhibits described as his liquidation analysis, income and expense projections, and plan disbursement projections. Monthly operating reports for January, February, and March 2021 were also filed. Those reports did not include related-entity reports.

The status hearing was held as scheduled. With the filing of the Debtor's various financial documents, Attorney Pioletti said that he believed the plan was ready to be processed and set for hearing on confirmation. Plan confirmation was then scheduled to be heard by video conference on July 26, 2021. The Court entered its standard orders giving notice of the setting and deadlines for sending ballots, voting, and filing objections. The order noted that it was up to the Debtor to decide whether to submit the plan for balloting by

creditors. The certificate of service later filed by Attorney Pioletti reported that ballots had not been sent to creditors.

Thereafter, Trustee Bourne filed his first application for compensation seeking $6175 in fees, which was scheduled to be heard at the July 2021 setting on plan confirmation. The IRS and IDOR filed responses to the Debtor's objections to their claims; the objection to the IRS claim became moot due to the filing of an amended claim, but the IDOR claim objection remained unresolved and was added to the July setting. First Bankers Trust Company filed a motion to compel abandonment of the commercial real estate owned by HRL Properties and located in Riverton, Illinois; a buyer for the property had apparently been secured for a price the lender was willing to accept. It also was set for hearing on the July date.

Several objections to plan confirmation were filed. First Federal Savings Bank filed an objection stating that, although the Debtor's TD Ameritrade account had been liquidated and applied toward his outstanding debt, the plan proposed payment of less than half of the outstanding amount secured by citation liens on the Debtor's other assets, including his interest in Louis Trucking and HRL Properties.[7] Trustee Bourne filed an objection questioning the necessity of asserted monthly expenditures in excess of $1500 for "Child Education" and "Child Sports," as well as the necessity of retaining certain

---

[7] First Federal Savings Bank obtained a judgment against the Debtor pre-petition. It recorded a memorandum of judgment that created a lien on the Debtor's residence. It also served a citation to discover assets, an Illinois collection remedy, that created a lien on all of the Debtor's non-exempt personal property. *See* 735 ILCS 5/2-1402(m). One of the Debtor's primary goals in this case was to save his home by avoiding the judgment lien on his residence in part and by paying the secured value of First Federal Savings Bank's claim through his plan.

unprofitable, encumbered real property. Trustee Bourne also asserted that the plan did not satisfy the liquidation value requirements of the Code because the Debtor had not filed required related-entity reports and had not accounted for the value of transfers of real estate that might be avoided for the benefit of the estate.

The UST filed a second objection to confirmation, noting that the Debtor had not filed the required reports regarding his various business interests and raising other issues. The objection highlighted that the Debtor's recently-filed liquidation analysis failed to include the values of various pieces of real property listed on his schedules or disclosed at his creditors meetings. The UST also noted that the $400 average monthly income from HRL Properties as stated on the Debtor's recently-filed income and expense projections was significantly less than the amounts shown on other documentation previously provided to the UST. The UST also expressed concern about the Debtor's monthly operating reports, which showed inadequate and declining cash flows and repeated bank overdraft charges, as well as allegedly-false assertions about insurance coverage and whether premiums were timely paid. Accordingly, the UST argued, the Debtor's budget was unrealistic and the plan was not feasible.

At the July 2021 hearing on confirmation and other matters, Attorney Pioletti conceded that, based on the objections filed, the plan was not ready for confirmation absent additional information. The Court agreed, noting that many of the objections were well taken and that it still had no idea what income the Debtor actually had, where it was coming from, or how the plan

would actually be funded. The Court noted that the few monthly reports that had been filed provided limited information about what was really being spent by the Debtor and showed that his cash flow was so tight that, in some months, he did not pay his mortgage or utility bills. The Court asked about the treatment of West Central Bank and First Bankers Trust Company and whether the Debtor really was proposing that they would be paid by the title holders to the secured properties when it appeared that many of the properties subject to their liens were in foreclosure or being disposed of through short sales. The Court also noted that the liquidation analysis filed in May failed to account for the Debtor's $15,000 homestead exemption when determining the value of the second priority judgment lien of First Federal Savings Bank on the Debtor's residence—a serious mistake not raised by the UST or Trustee Bourne. The liquidation analysis also failed to provide a value for the Debtor's interest in Louis Trucking and other assets upon which First Federal Savings Bank had a lien.

Attorney Pioletti admitted that he had made a mistake in his liquidation calculations but was adamant that, despite the issues with the Debtor's financial reporting, the income of Louis Trucking would, in time, prove to be sufficient to fund the plan. He also pointed out that a recently-filed monthly report for June showed $10,000 in additional income, although he also admitted that the funds came from a Go Fund Me solicitation made on behalf of the Debtor to cover his medical bills. Rather than file an amended plan, Attorney Pioletti asked for additional time to supplement the information

already provided. The objecting parties reiterated their concerns about the plan and where the case was headed.

First Bankers Trust Company was heard on its motion to compel abandonment, and the motion was allowed without objection. The IDOR claim objection was also discussed, and the attorney for IDOR said that the Debtor's returns had not been processed and that the matter was therefore not yet ripe for resolution. Finally, the Court addressed Trustee Bourne's first application for compensation and expressed its intention to trace the application with plan confirmation. Trustee Bourne said he would defer to the Court but asked it to consider interim compensation in Subchapter V cases. The Court set the Trustee's application, along with the plan and unresolved IDOR claim objection, for a continued hearing on August 24, 2021. Before concluding the hearing, the Court expressed its expectation that the Debtor would provide complete and adequate information to support plan confirmation by the continued hearing date.

Several days before the August hearing date, the Debtor filed amended income and expense projections and an amended liquidation analysis accounting for the Debtor's $15,000 homestead exemption and valuing his previously-unaccounted-for interest in assets subject to First Federal Savings Bank's citation liens. He also filed his July monthly operating report, as well as a profit and loss statement and an exhibit purporting to show the Debtor's actual income and expenses for the period covering April 2021 through July 2021.

The first matter taken up at the August hearing was the pending objection to the IDOR claim. Mr. Pioletti reported that there was some confusion about whether the Debtor's state tax returns were ever actually filed and that he had just sent signed copies of the returns directly to the attorney for IDOR earlier that morning. As such, the claim objection was not ready to be resolved, but the attorney for IDOR appeared and said that he could process the returns within fourteen days. As to the Debtor's plan, Attorney Pioletti said he was ready to proceed toward confirmation. The UST's attorney said he still had reservations about the feasibility of the plan but would not stand in the way of confirmation. Trustee Bourne said he also still had some reservations but, based on the recent filings of the Debtor, believed that the Debtor should be given a chance and recommended confirmation of the plan. Despite the Court having continued concerns about significant deficiencies, because no interested parties sought to prosecute their objections, it said it would confirm the plan as filed. But, as the IDOR claim objection had still not been resolved and would inevitably impact the plan terms, both matters were set for further status a few weeks later. Trustee Bourne's fee application was continued with the other pending matters, and the Court informed both Trustee Bourne and Attorney Pioletti that they should file final applications for compensation, all of which would be taken under advisement together after confirmation—any lack of objection notwithstanding—so that the Court could take a close look at everything that had occurred in what it said was becoming an increasingly troubling case.

On September 12, 2021, Attorney Pioletti filed his First Application for Interim Attorney Fees and Reimbursed Costs of Counsel to Debtor, seeking an award of $7112.50 in fees and no reimbursement of costs. The application asserted $200 in fees incurred—less than one hour of time—for preparing the Debtor's amended schedules in the converted case, $450 incurred resolving disputed claims and filing motions to sell the assets of the Debtor's TD Ameritrade account and for authority to make adequate protection payments on the Debtor's home mortgage debt, $4075—more than sixteen hours— incurred for cooperating with and providing documentation to the UST and participating in several creditors meetings, $1787.50—more than seven hours—incurred drafting and filing a plan and facilitating confirmation, and $600 incurred securing employment and compensation for himself and other professionals.

On September 14, 2021—the day of the continued hearing on plan confirmation—Trustee Bourne filed as correspondence a five-page draft of a proposed confirmation order that included several new provisions and materially altered the terms of the initial plan. The proposed order made specific findings that the Debtor had complied with all applicable Code requirements and that the plan was filed in good faith, did not discriminate, was fair and equitable, provided for payment to impaired creditors in excess of the value that would be received through liquidation, and, among other things, was feasible and not likely to be followed by liquidation or a need for further reorganization. The proposed order also provided for a discharge of the debts

owed to West Central Bank and First Bankers Trust Company even though the plan terms provided that the debts would be paid by the title holders— apparently under the original contract terms that would have extended past the plan term.

At the hearing, the Court first disposed of the pending objection to IDOR's claim, noting that an amended claim had been filed by IDOR and that the objection to the original claim was therefore moot. Moving next to plan confirmation, the Court reiterated its intent to confirm the plan that was filed but said that it would not sign the proposed order submitted by Trustee Bourne or any order like it because it included findings and assertions that were simply not true and added provisions that should have been included in the plan in the first place.[8] The Court offered three options: it could confirm the plan as filed, without incorporating the provisions of the proposed order; it could give the Debtor an opportunity to file an amended plan incorporating the additional provisions set forth in the proposed order, subject to the Debtor putting in the work necessary to justify any factual findings to be made regarding his satisfaction of Code requirements; or it could give the Debtor an opportunity to prove up confirmation by showing that the documents already on file supported the findings included in the proposed order. The Debtor

---

[8] The fact that many of the participating creditors had apparently approved the order was not sufficient to gain the Court's approval. The Debtor's original plan was not balloted, and creditors not present or not represented in the case could not be presumed to approve an order they had not seen and that materially changed the terms of the plan. Further, if all creditors really were in agreement, as represented by Trustee Bourne, then consensual confirmation was within reach and the Trustee had a fiduciary duty to recommend and support efforts to obtain such a confirmation. Having everyone consent to a nonconsensual confirmation made little sense and did not appear to be in the best of interest of the Debtor. The Court is not aware of any circumstance under which an unballoted cramdown plan could be modified by agreement and confirmed consensually under §1191(a) without proper notice.

ultimately elected to proceed with filing an amended plan and to seek consensual confirmation of the amended plan through balloting. An order was entered denying confirmation of the original plan and granting the Debtor until October 12, 2021, to file a first amended plan.

Following the hearing, Trustee Bourne filed correspondence directed to the Clerk of Court complaining that the Court had concluded the hearing without addressing his application for compensation that was being traced with plan confirmation. He stated that the application had been pending for three months and that no party in interest had filed an objection. He asked that an order be entered granting the relief requested in his application.[9]

The Court entered an order inviting Trustee Bourne to supplement his first application for compensation before an objection date was set and the matter taken under advisement. The Court noted that the application was being traced for confirmation and had not therefore been noticed for objections but also that the application lacked the detailed information required for the Court to conclude that the services rendered were reasonable, actual, and necessary. As such, Trustee Bourne was given an opportunity to supplement the filing before it would be fully processed and decided. Specifically, the Court asked that Trustee Bourne address his efforts to "facilitate the development of a consensual plan of reorganization" consistent with his obligations under §1183(b)(7), his role in the Debtor's decision to forego a consensual plan early

---

[9] It is not clear why Trustee Bourne sent a letter to the Clerk to complain about the Court. The Clerk is the keeper of records and provides day-to-day operational support necessary for the Court to function. The Clerk does not play any role, however, in the substantive decision-making of the Court. Generally, if an attorney wants an order or some action from the Court, a motion is required. Fed. R. Bankr. P. 9013.

on, and how he proposed to pay himself in relation to other claims to be paid in the case. The order suggested that the Debtor might benefit by proposing the payment of priority tax claims in full as of the date of confirmation and that it appeared that Trustee Bourne was holding enough funds to make such payments. The order also noted that no one involved in the case had yet been paid—Trustee Bourne was not alone. Trustee Bourne then filed a motion to withdraw his application for compensation without prejudice on the basis that the Debtor was working toward a consensual amended plan that would also account for the Trustee's compensation, making consideration of his pending application unnecessary. The motion to withdraw was allowed.

The Debtor filed his amended plan on October 4, 2021. The amended plan provided for payment of administrative expenses, including the Trustee's and other professionals' fees, in full upon confirmation with the exception that the Debtor's attorney's fees would be paid after confirmation in installments. It recited Trustee Bourne's agreement to cap his fees at $10,000 if confirmed. In addition, although the amended plan continued to separately classify priority tax claims, it identified such claims as unimpaired and provided for payment of those claims in full within fourteen days of confirmation. The plan still provided that West Central Bank and First Bankers Trust Company would be paid by the title holders to the secured properties but specifically provided for the discharge of the Debtor as to his personal guarantees on the debts. Referenced exhibits were attached to the amended plan. The Court entered its standard

order setting deadlines and procedures for balloting, voting, and objections, and scheduling the hearing on confirmation for November 18, 2021.

The UST filed an objection to confirmation of the amended plan raising concerns about feasibility. The objection asserted that, based on the information provided, the Debtor's actual income in excess of expenses had never met his projections without significant outside assistance in the form of gifts or donations. Further, the Debtor was still behind in his filing of monthly operating reports, and the amended plan language remained cryptic as to the payment schedule for administrative expenses. Compounding matters, the amended plan did not provide appropriate remedies to protect creditors if and when plan payments were not made.

Prior to the hearing on confirmation, the Debtor filed monthly operating reports for August and September 2021, as well as a report on balloting that showed unanimous acceptance among impaired classes of claims. Trustee Bourne filed a confirmation report highlighting the support of creditors evidenced by the ballot report and touting his own efforts to facilitate consent through communication with interested parties. He asserted that the Debtor's projected disposable income was therefore not an issue but that, to the extent necessary, the Debtor had satisfied all disposable income requirements. The Trustee informed the Court that the Debtor had made preconfirmation payments totaling $10,000, which would be used to pay administrative expense priority claims first, suggesting that payment of priority tax claims could be detailed in the confirmation order. He acknowledged that the Debtor's financial

reporting in the case had not been ideal but contended that better reporting could have only been obtained through retention of more professionals and at great expense to the estate. Because the Debtor made the proposed preconfirmation payments, the Trustee supported giving the Debtor the benefit of any doubt that he would be able to complete the plan.

At the November 2021 hearing on the amended plan, the Court noted the UST's objection as to plan feasibility; the UST's attorney acknowledged the filing of the missing monthly operating reports cited in the objection but said he had not had time to review them and was not prepared to withdraw the objection. As such, the amended plan was set for evidentiary hearing on the issue of feasibility subject to the UST's objection being resolved before then.

The Debtor later filed his monthly operating report for October 2021, and the UST moved to withdraw her objection to the amended plan having concluded that the monthly operating reports filed since the objection showed sufficient reserve funds to pay administrative claims and other costs and sufficient cash flow to satisfy the UST's concerns. The UST's motion was granted, but the hearing, scheduled for December 15, 2021, remained set to address remaining details and issues related to confirmation.

At the December hearing, with the only objection having been resolved, the Debtor asked that his amended plan be confirmed. The Court stated it would confirm the amended plan and directed Attorney Pioletti to submit the confirmation order with the signed approval of the UST and Trustee Bourne. Attorney Pioletti was also instructed to include a provision for the filing of

professional fee applications within thirty days of confirmation, which would be taken under advisement after an objection period. Trustee Bourne raised two other issues at the hearing: he noted a discrepancy in the amended plan as to the amount of West Central Bank's claim, which he suggested could be resolved in the confirmation order, and he noted that the Debtor had not completed a financial management course, which was a prerequisite to discharge that could hold up entry of the confirmation order through which the Debtor would be granted his discharge.

Trustee Bourne, rather than Attorney Pioletti, subsequently submitted a proposed confirmation order. A notice of order deficiency was issued explaining that the proposed order was deficient and would not be signed. The notice explained that the proposed order contained provisions for the treatment of creditors not included in the plan and not otherwise specifically authorized at the December hearing. The proposed order also gave only fourteen days for the filing of fee applications as opposed to the thirty days granted by the Court at the December hearing. Finally, the notice reminded the Debtor that he had not filed a certificate of completion of a financial management course and that a confirmation order granting him a discharge could not be entered until such certificate was filed. The Debtor filed his certificate of completion of a financial management course on January 18, 2022, and, on January 19, 2022, an order confirming the Debtor's first amended Chapter 11 plan was finally entered.

Trustee Bourne timely filed his Final Application for Allowance of Subchapter V Trustee Compensation seeking an award of $10,000 in fees and

no expense reimbursement. The application asserts $13,175 in fees actually incurred over 52.7 hours, which he broke down into ten categories. The bulk of the asserted charges fell into one of a few categories relating to plan confirmation, namely $3650 for time spent on "plan confirmation issues" and $3575 for the Trustee's efforts to "facilitate consent plan." Much of the time billed in those categories, as well as others, appeared to be spent reviewing docket entries and filings and attending hearings and proceedings. Other charges covered email communications with and the drafting and circulation of proposed orders amongst counsel for the Debtor, UST, and other interested parties.

Attorney Pioletti did not file a second fee application. After the deadline to file fee applications passed, objection date notices were issued as to the pending fee applications of Trustee Bourne and Attorney Pioletti. No objections were filed. The Court then took the matters under advisement, and they are now ready for decision.

## II.    Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). Matters involving the administration of the estate, the allowance of claims against the estate, and the adjustment of the debtor-creditor relationship are core proceedings. 28 U.S.C. §157(b)(2)(A), (B), (O).

These matters arise from the Debtor's bankruptcy itself and from the provisions of the Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

### III.   Legal Analysis

Attorney Pioletti and Trustee Bourne both seek compensation under 11 U.S.C. §330. That section "provides the statutory authority for awarding compensation for the services and reimbursement for the expenses of properly employed professionals." *In re Gvazdinskas*, 2010 WL 1433308, at *2 (Bankr. C.D. Ill. Apr. 8, 2010) (citing 11 U.S.C. §330). Attorney Pioletti's employment as the Debtor's counsel was approved on March 24, 2021, laying the foundation for his request for compensation under §330. Trustee Bourne is not a standing trustee; he was appointed as a disinterested person to serve in this case by the UST and therefore, it seems, may also seek compensation under §330. *See* 11 U.S.C. §§326(b), 330(a), 1183(a); *In re Tri-State Roofing*, 2020 WL 7345741, at *1-3 (Bankr. D. Idaho Dec. 7, 2020) (concluding that Subchapter V trustee compensation under §330(a) was neither barred nor capped by §326(b)).[10]

---

[10] *Tri-State Roofing* analyzed an apparent discrepancy in §326 regarding limitations on trustee compensation. Subsection (a), which sets limits on Chapter 11 trustee compensation based on disbursements made, explicitly does not apply in Subchapter V cases. *See* 11 U.S.C. §326(a). Subsection (b) clearly applies to Subchapter V cases, specifically barring compensation for the UST or a standing trustee appointed under §586(b). *See* 11 U.S.C. §326(b). But the second half of that provision, which provides for compensation under §330 for trustees appointed under §§1202(a) and 1302(a) subject to a cap of five percent of all plan payments, makes no reference to trustees appointed in the context of Chapter 11 or Subchapter V or under the provisions thereof. *See id.* The court in *Tri-State Roofing* suspected that the omission may have been the result of a legislative drafting error but ultimately concluded that the language of the statute could be enforced as written, neither precluding nor capping compensation of a Subchapter V trustee under §330(a). In this case, Trustee Bourne made it apparent in his verified statement accepting appointment as trustee in the case, as well as his fee applications, that he would be seeking compensation

Generally, a court may award professionals, including attorneys and trustees, "reasonable compensation for actual, necessary services rendered" and reimbursement of actual and necessary expenses. 11 U.S.C. §330(a)(1)(A)-(B). In order for compensation to be awarded, a fee application must be "filed with the court which details the work done and expenses advanced for which compensation is sought." *In re Vancil Contracting, Inc.*, 2008 WL 207533, at *2 (Bankr. C.D. Ill. Jan. 25, 2008); *see* Fed. R. Bankr. P. 2016(a). The applicant bears the ultimate burden of proving entitlement to the fees asserted in its application. *In re Earl Gaudio & Son, Inc.*, 2019 WL 1429978, at *9 (Bankr. C.D. Ill. Mar. 29, 2019) (citations omitted).

Regardless of whether interested parties object to awarding compensation, the court has an independent duty to examine the reasonableness of fee requests. *Id.* (quoting *Vancil Contracting*, 2008 WL 207533, at *2); *see also Gvazdinskas*, 2010 WL 1433308, at *2 (collecting cases). To that end, §330 further provides that "the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including" but not limited to the time spent, the rates charges, and "whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of," the case. 11 U.S.C. §330(a)(3). Services that the court determines were not

pursuant to §330. No objections were raised as to his appointment or request for compensation, and it is worth noting that the UST's position, as stated in its Program Policy and Practices Manual, is consistent with the holding of *Tri-State Roofing* that compensation may be awarded to case-by-case trustees under §330(a) without limitation. *See* United States Trustee Program Policy and Practices Manual, Vol. 3: Chapter 11 Case Administration, §3-17.15.2, p. 206. Under the circumstances, the Court will not engage in protracted analysis of the application of §326 to Subchapter V cases. It suffices to recognize the potential issue created by the amendments made by the Small Business Reorganization Act of 2019, Pub. L. No. 116-54, 133 Stat. 1079.

reasonably likely to benefit the estate or were not necessary to the administration of the case are not compensable. 11 U.S.C. §330(a)(4)(A)(ii).

Fee applications "must provide sufficient information for a court to understand what services were actually provided and to determine whether the fees requested are reasonable and the services rendered were necessary and beneficial." *Gvazdinskas*, 2010 WL 1433308, at *2. It is therefore imperative that they include not only a detailed statement of each service performed, the time expended, and the compensation sought but also a narrative explaining the necessity of those services. *Id.* Such "detailed applications establish the 'actual,' while an accompanying narrative explanation of the 'how' and 'why' establishes the 'necessary.'" *In re Wildman*, 72 B.R. 700, 707 (Bankr. N.D. Ill. 1987). The narrative portion of a fee application provides the opportunity for a professional to establish that the work done was necessary and beneficial to the estate. Simply providing details of the time spent and the task completed is often insufficient to make the case that the time should be compensated. Courts are not required to scour the record to find justification for awarding compensation where the applicant has not endeavored to do so. *Earl Gaudio & Son*, 2019 WL 1429978, at *9 (citations omitted).

Both fee applications here will be approved in full. Confirmation of a consensual Chapter 11 Subchapter V plan was achieved, and as a result, the Debtor has been granted his discharge and will have an opportunity at a fresh start. But it was a long haul getting there, complicated by problems that could have been easily curtailed or avoided altogether if both Attorney Pioletti and

Trustee Bourne had been more attentive to their duties. The purpose of adding the Subchapter V provisions to the Code was to streamline the Chapter 11 process and make relief more accessible and cost-effective for small business debtors. *See In re MCM Natural Stone, Inc.*, 2022 WL 1074065, at *1 (Bankr. W.D.N.Y. Apr. 8, 2022) (citations omitted). "Subchapter V by its very nature is intended to be an expedited process." *In re Wetter,* 620 B.R. 243, 251 (Bankr. W.D. Va. 2020) (citing *In re Seven Stars on the Hudson Corp.*, 618 B.R. 333, 346 (Bankr. S.D. Fla. 2020)). That is not what occurred here. Rather, it took the better part of a year and significant expense to confirm a plan in what was essentially a "save-the-house" case.

To some degree, the issues in this case could be attributed to a lack of experience—Subchapter V is a relatively new creature of the Bankruptcy Code, and this case was Attorney Pioletti's first foray into the Chapter 11 practice area and, to the Court's knowledge, Trustee Bourne's first appointment as trustee. But many of the problems here were the result of perfunctory efforts made in haste and, at times, cavalier attitudes. Because the Court has serious concerns about this case setting the bar for handling Subchapter V cases going forward and the impact it might have in pricing such cases out of the market in Central Illinois, each applicant's request and their involvement in the case will be discussed in detail.

### A. Attorney Pioletti's Fee Application

This case started as one under Chapter 13. It was filed on the heels of the dismissal of a prior Chapter 13 case that was problematic for several reasons, including that the Debtor's debts exceeded the statutory debt limits and that he had not filed tax returns for several years. Despite Attorney Pioletti's contention that such issues had been resolved in the nine days between the dismissal of the first case and the filing of the second case, the problems persisted and stymied the Debtor's ability to obtain relief in the second filing. In the hurried effort to refile the Debtor's Chapter 13 case and extend the automatic stay, Attorney Pioletti did not initially file the Debtor's schedules and other required documents, which, once prepared and filed two weeks later, reprised concerns about the Debtor's eligibility for Chapter 13 relief. Conversion to Chapter 11 Subchapter V allowed the Debtor to sidestep the issues in the short term. But as the Court mentioned at the time, Attorney Pioletti's lack of experience in Chapter 11 matters needed to be offset by diligence and hard work if he expected the Chapter 11 to be more successful than the Debtor's two Chapter 13 efforts. Unfortunately, Attorney Pioletti appears to have not put in the effort necessary to meet the challenge.

The Debtor struggled to file required documents, and those that he did file were severely lacking in worthwhile detail. For instance, his status report, filed in anticipation of the 60-day case status conference was apparently copied from a document filed by Trustee Bourne in another case, contained only a few cryptic statements about determining the liquidation value of his home and

negotiating the retention of real property, and did not even address the sole statutory directive to detail the efforts he had undertaken and would undertake to attain a consensual plan of reorganization. *See* 11 U.S.C. §1188(c).

The Court and attorney for the UST expressed concerns at the status conference about the lack of financial information provided and general lack of progress in the case. Attorney Pioletti, in turn, made assurances that the needed information would be forthcoming and that a confirmable plan would be filed by the 90-day deadline. Attorney Pioletti's time records indicate, however, that, at the time of the status conference, he had engaged in one phone call with Trustee Bourne about the plan but otherwise had not expended any time on plan development. His time records show that he began work on the plan two days before it was due and spent only about two hours drafting and refining the document.

When the plan was filed, the Debtor had still not provided all required information, and the plan itself was so defective that it could not be processed. Attorney Pioletti elected not to include a disclosure statement with the plan but also failed to include the sort of financial information that would have allowed interested parties to make an informed judgment about it. The plan made reference to several exhibits, but no such exhibits were attached or otherwise provided. Over the next several months, financial disclosures and outstanding documents slowly trickled in, but many of the Debtor's filings raised serious additional concerns about feasibility rather than answering outstanding questions or supporting confirmation.

In hindsight, it is obvious that Attorney Pioletti was not prepared to represent the Debtor in this Chapter 11 case. Chapter 11 imposes fiduciary duties on debtors and their attorneys unlike the duties of Chapter 13 debtors with which Attorney Pioletti is familiar. *In re Ryan 1000, LLC*, 631 B.R. 722, 738 (Bankr. E.D. Wis. 2021) (citations omitted). Likewise, Chapter 11 imposes administrative tasks on debtors and their attorneys such as preparing and filing monthly operating reports and producing other financial information not typically required in the consumer cases regularly handled by Attorney Pioletti. *Id.* To competently represent a debtor in Chapter 11, an attorney must have specialized knowledge and expertise. And although "every Chapter 11 lawyer of course must have a 'first case,' courts expect attorneys to approach such cases with diligent Code compliance, attention to detail, timely completion of required tasks, and most likely, under the guidance of more experienced counsel." *Id.* at 739.

Attorney Pioletti's application for compensation and attached time records show a lack of diligence and little attention to detail. Not one time entry suggests that Attorney Pioletti did any basic research on Chapter 11, an area in which he was admittedly a novice, and, even more troubling, not one time entry suggests he did any research into the provisions of the new Subchapter V that he had elected for the Debtor. It seems unlikely that Attorney Pioletti fully understood the implications of bypassing consensual confirmation of a plan; his time records do not show that he researched the issues or that he talked at any length to Trustee Bourne, the attorney for the UST, creditors' attorneys, or

anyone else—including the Debtor—about the issues before filing the initial plan.

Subchapter V was added to Chapter 11 to help small businesses reorganize efficiently. Many of the provisions of Chapter 11 that can impede reorganization efforts do not apply in these small business cases. *See* 11 U.S.C. §1181(a). Further if a debtor complies with all confirmation requirements and obtains what is now commonly referred to as consensual confirmation of a Subchapter V plan, the debtor receives a discharge at that time and property acquired after filing, with some limited exceptions, does not become property of the estate. 11 U.S.C. §§1186, 1191(a), 1192. Also, if a debtor obtains consensual plan confirmation, the trustee is discharged upon substantial consummation of the plan, saving the debtor the on-going cost of paying the trustee. *See* 11 U.S.C. §1183(c)(1). The benefits of obtaining Subchapter V consensual confirmation are significant and should have been known to Attorney Pioletti when he sought conversion. Again, unfortunately, it does not appear that he fully grasped the importance to his client of at least trying to obtain consensual confirmation.

Attorney Pioletti's application for compensation includes a breakdown of the time entries into project categories, but the narratives for each category are perfunctory and contain little helpful information. One project category is for "Discharge Matters" and shows that Attorney Pioletti spent no time on the issue. His narrative says no adversary proceedings were filed, and that is true; no one objected to the Debtor's discharge or sought to except a debt from his

discharge. But helping the Debtor obtain a discharge was an important responsibility of Attorney Pioletti's and one that he ignored in first seeking nonconsensual plan confirmation. 11 U.S.C. §§1141(d)(5), 1181(a), 1192. The Debtor ultimately received a discharge with the entry of the consensual confirmation order, but that occurred only because the Court pushed Attorney Pioletti on the issue and refused to confirm the initial plan with the order proposed by Trustee Bourne.

Here, the Debtor has serious health problems and is starting a new business that he and Attorney Pioletti insist will grow and produce significant revenue. Getting a discharge on the front end rather than five years down the road would seem to provide obvious advantages to the Debtor that Attorney Pioletti was ready to sacrifice for no apparent reason other than that he did not research the issue. Even a fairly modest amount of research should have alerted Attorney Pioletti to the difference in the timing of the issuance of a discharge between Subchapter V debtors who obtain consensual confirmation of their plans and those who do not.[11] Attorney Pioletti never explained at any of the hearings or in his fee application why he chose to not even try to obtain consensual confirmation of the Debtor's initial plan. That failure is emblematic

---

[11] If he had researched the issue, Attorney Pioletti might have found the path to an answer a little circuitous but ultimately not that hard to navigate. If he had looked at the discharge provisions for Chapter 11, he would have learned that individuals generally do not receive discharges until plan payments are completed. 11 U.S.C. §1141(d)(5)(A). But a key provision of Subchapter V is §1181(a), which lists the sections of Chapter 11 that do not apply in Subchapter V cases. 11 U.S.C. §1181(a). Section 1181(a) says that §1141(d)(5) does not apply in Subchapter V cases. Section 1181(c) also refers to special provisions regarding discharges in Subchapter V and would have led Attorney Pioletti to §1192, a provision that delays discharges for debtors who obtain confirmation of nonconsensual plans but does not impact discharges obtained through consensual confirmation. 11 U.S.C. §1192. Similarly, if Attorney Pioletti had researched the issues, he would have seen another key benefit to consensual confirmation related to property of the estate and learned that property acquired post-petition is generally not property of the estate of a Subchapter V debtor who obtains consensual confirmation. 11 U.S.C. §§1115, 1181(a), 1186.

of Attorney Pioletti's lack of attention to detail and his failure to develop the necessary expertise to represent the Debtor here.[12]

The tax issues reportedly cured between the filing of Chapter 13 cases also became an obstacle in the converted case. The IRS filed a significant estimated priority claim based on several years of unfiled returns, and IDOR filed a priority claim noting unfiled tax returns and taxes due in unknown amounts. Despite claiming to have filed the missing returns between bankruptcy cases—well before the IRS and IDOR claims were filed—Attorney Pioletti did not object to the claims before filing the Debtor's plan and instead simply proposed payment of the estimated amounts. Although concerns were raised at the April 2021 hearing on the plan, Attorney Pioletti did not file objections to the tax claims until the day before the continued hearing date a month later. The IRS claim was quickly resolved with the filing of an amended claim for half the amount of the original claim and even less asserted as being entitled to priority treatment. But the IDOR claim lingered with confusion about whether and what returns were filed until the matter was finally resolved by the filing of an amended claim several months later.

The lingering tax issues here were particularly frustrating because they were neither surprising nor complex. Attorney Pioletti had identified the tax

---

[12] Attorney Pioletti also potentially exposed the Debtor to not having several large debts included in any discharge he received, regardless of when it was received. In his initial plan, he proposed that the debts owed to West Central Bank and First Bankers Trust Company would be paid by the title holders to the property securing such debts. Those debts were long-term mortgage loans that, by their own terms, were not likely to come due within the five-year plan term and therefore would not have been included in any discharge. 11 U.S.C. §1192(1). The initial plan provisions for these creditors seemed incorrect in many respects because many of the properties were in foreclosure, the co-debtors were in a Chapter 7 bankruptcy, and the entities holding title were operating at a loss. It appears that little thought went into these particular plan provisions. This issue was ultimately resolved favorably for the Debtor in his amended plan, but Attorney Pioletti's initial failure to identify the issue and address it remains troubling.

issues in the Chapter 13 filings and knew that some portion of the IRS and IDOR claims were priority claims. *See* 11 U.S.C. §507(a)(8). And he most certainly knew or should have known that such priority claims would be nondischargeable. *See* 11 U.S.C. §523(a)(1)(A). What he may not have known but should have researched is how the claims needed to be treated in the Debtor's plan. Attorney Pioletti used a variation of Official Form 425A Plan of Reorganization for Small Business under Chapter 11 in drafting the initial plan, and that document, in the preprinted portions, provides the guidance that "Under section 1123(a)(1) . . . priority tax claims are not in classes." That should have led Attorney Pioletti to §1123(a)(1) for clarification that priority tax claims described under §507(a)(8) are not separately classified and that the holders of such claims do not vote but must be provided for and paid as required by §1129(a)(9). 11 U.S.C. §§507(a)(8), 1123(a)(1), 1129(a)(9)(C); *In re K Lunde, LLC*, 513 B.R. 587, 591-92 (Bankr. D. Col. 2014); *see also In re New Hope Hardware, LLC*, 2020 WL 6588615, at *1-2 (Bankr. N.D. Ga. Sept. 9, 2020) (Subchapter V consensual confirmation allowed where debtor agreed to pay priority tax claims within five years with interest as required by §1129(a)(9)(C)—failure of priority tax claimants to vote for confirmation was not an issue).

Attorney Pioletti was aware of the tax issues before conversion, and both the IRS and IDOR timely filed claims showing that all returns had not been filed. Attorney Pioletti's time records do not, however, show any efforts to get the returns filed or to communicate with the attorneys for the IRS or IDOR

about the filing or refiling of missing returns to expedite resolution of the claims. Only after months of no action did he file claim objections. The objection to the IRS claim prompted the filing of an amended claim that reduced the priority portion of the claim from over $23,000 to less than $3000. The objection to the IDOR claim drew a response indicating that issues still existed with the previously-unfiled returns. Ultimately, months later, IDOR filed an amended claim increasing its priority claim to $5076.38. As the Court cautioned early in the case, having all the returns on file and knowing the amounts of priority tax claims to be paid was necessary to confirm any plan. Attorney Pioletti's failure to hustle on the tax issues certainly delayed confirmation.

Initially, the plan provided for the priority tax claims to be paid over the full five-year term of the plan at the discretion of the Trustee. This provision was also troubling because the priority taxes appeared to be the only nondischargeable debts of the Debtor and getting them paid sooner rather than later would have benefited the Debtor if he were unable to complete his plan. Frustrated with Attorney Pioletti's lack of diligence on this issue and with the Trustee's focus on getting paid immediately and ahead of all other claimants, the Court suggested in an order entered September 16, 2021, that it would be in the Debtor's best interest to pay his priority tax claims in full as of the effective date of any confirmed plan. That provision was included in the amended plan that was consensually confirmed.

Attorney Pioletti's fee application is based on services provided only through September 12, 2021; he did not file a final application seeking compensation for any time thereafter, which would have covered the filing of and confirmation efforts regarding the amended plan that was eventually confirmed. This Court interprets the provisions of Chapter 11 Subchapter V to require at least some attempt at consensual confirmation for a plan to be put forth in good faith. Indeed, other courts have held that the Subchapter V provisions contemplate that creditors will vote to accept or reject a proposed plan. *See, e.g.*, *In re Robinson*, 632 B.R. 208, 216 (Bankr. D. Kan. 2021). Attorney Piolett's failure to explain the initial decision not to ballot remains a concern.

Again, the lack of effort, attention, and follow through in what should have been a fairly straightforward case is frustrating. This case was Attorney Pioletti's opportunity to step up his game and begin to expand his practice to include Chapter 11 cases. That he chose, at virtually every turn, not to make the effort is disappointing. The issues of consensual plan confirmation, discharge, and priority taxes already discussed were not the only problems. Mr. Pioletti's failure to account for the Debtor's homestead exemption and other encumbered property in the liquidation analysis he eventually provided, or the inexplicable delay in his client completing a financial management course that was the final hurdle to confirmation, are other examples of the avoidable problems that dogged this case. Nevertheless, a plan was confirmed, and the Debtor may be able to reorganize.

No objections were filed to Attorney Pioletti's fee application. Attorney Pioletti was employed at a reasonable hourly rate of $250; the compensation requested in his interim application is based on that amount. He did not file a final application. The $7112.50 requested therefore covers only a portion of the time he actually spent on the case. That amount is well within the realm of reasonable compensation for a debtor's attorney in a Chapter 11 Subchapter V case in which confirmation was achieved. Indeed, if more time had been spent, more fees would have been incurred. Attorney Pioletti could have served the Debtor better throughout the case and appears to have exercised some serious billing discretion to compensate for his mistakes. For that reason, and notwithstanding the many problems in the case, Attorney Pioletti's fee application will be approved, and he will be awarded compensation in the amount of $7112.50. The Debtor may pay the amount as he is able; the Court sets no deadline on the payment of the fees other than the expected five-year completion of the confirmed plan.

## B. Trustee Bourne's Fee Application

A trustee appointed in a Subchapter V case serves in a unique role. *In re 218 Jackson LLC*, 631 B.R. 937, 946 (Bankr. M.D. Fla. 2021). Of course, Subchapter V trustees have many of the same duties as their counterparts in Chapters 7, 11, 12, and 13. They must account for all property received, examine proofs of claims if a purpose would be served, respond to information requests from parties in interest, and make a final report and accounting on

the administration of the estate. *See* 11 U.S.C. §§704(a)(2), (5), (7), and (9), 1106(a)(1), 1183(b)(1), 1202(b)(1), 1302(b)(1). They are required to appear and be heard at the §1188 status conference, as well as any hearing concerning the value of encumbered property, plan confirmation or modification, and the sale of estate property. 11 U.S.C. §§1183(b)(3), 1202(b)(3), 1302(b)(2). But it is another duty that sets Subchapter V trustees apart.

The Subchapter V trustee's primary duty is to "facilitate the development of a consensual plan of reorganization." 11 U.S.C. §1183(b)(7); *In re Ozcelebi*, 2022 WL 990283, at *7 (Bankr. S.D. Tex. Apr. 1, 2022); UST Program Policy and Practices Manual, §3-17.1.1, p. 189 ("A trustee is appointed in every [Subchapter V] case tasked primarily with facilitating a consensual plan."). It is a significant distinction shared by no other trustee in bankruptcy. *218 Jackson*, 631 B.R. at 947. And it makes the Subchapter V trustee's role more like that of a mediator than other trustees who have traditionally taken on a more adversarial role. *Id.* (citing *Seven Stars on the Hudson*, 618 B.R. at 346 n.81).

As mentioned in the discussion of Attorney Pioletti's fee application, it is clear that a decision was made early on in this case to forego consensual plan confirmation without any apparent attempt at negotiation. And although it was the exclusive right of the Debtor to propose a plan of reorganization, it is evident that Trustee Bourne played some part in how Attorney Pioletti and the Debtor approached the issue given that the Debtor's initial status report expressing his intention to forego consensual confirmation was clearly copied

from a document filed by Trustee Bourne as counsel for a debtor in another case. Exactly how much of a part Trustee Bourne played in that decision is not known; he declined the Court's invitation to provide an explanation of his role. His time records, however, reflect little to no effort in facilitating a consensual plan for the first several months of the case.[13]

The lack of effort likely stemmed from a misunderstanding not only by Attorney Pioletti but also by Trustee Bourne of the benefits of consensual confirmation—discharge at confirmation, the exclusion of property acquired post-petition as property of the estate, and termination of a trustee's services and charges upon substantial consummation of the plan. Absent an understanding of the real benefits to the Debtor of pursuing consensual confirmation, both Attorney Pioletti and Trustee Bourne apparently decided early on that pursuing a consensus would not be worth their time and effort and therefore agreed to sacrifice the benefits available to the Debtor. But although the provisions of Subchapter V do not affirmatively require a debtor to try to attain a consensual confirmation—indeed there are undoubtedly circumstances under which any attempt at obtaining consensual confirmation would be futile—the Debtor's decision in this case to forego that effort from the start was certainly contrary to the spirit of the law. And, as it pertains to the Trustee's role, it was contrary to both the spirit and letter of the law. *See* 11 U.S.C. §1183(b)(7); *Ozcelebi*, 2022 WL 990283, at *7; UST Program Policy and Practices Manual, §3-17.1.1, p. 189.

---

[13] Prior to September 2021, Trustee Bourne had billed more time for reviewing the Debtor's status report that was copied from his own in another case than he had spent on any meaningful effort to facilitate a consensual plan.

In his narrative included with his fee application, Trustee Bourne frames the issue as one of futility based on the substantial priority tax claims that the Debtor could not have paid without impairing them; as he said, it was only after amended claims were filed that the possibility opened for a consensual plan. But the tax issues in this case were not overly complicated. And according to Trustee Bourne's own time records, he did not approach the tax claimants about the possibility of a consensual plan until the end of May 2021—well after the original plan was filed and the Court had raised the issues at hearing.[14] The reality, from what the Court can glean from the record, is that the tax issues were not even part of the calculus to forego a consensual plan and that Trustee Bourne did nothing to facilitate consensual confirmation until well into the case and after the Court repeatedly stressed the importance of doing so.

Equally important, Trustee Bourne appears to not be acquainted with the required treatment of priority tax claims in Chapter 11 cases. As set forth above, such claims are not classified and do not vote. 11 U.S.C. §1123(a)(1); *K Lunde*, 513 B.R. at 591. The Court's repeatedly-expressed concerns about the priority tax claims stemmed from the fact that the amount of such claims had to be known before confirmation to make sure that they would be paid as required. *See* 11 U.S.C. §1129(a)(9); *New Hope Hardware*, 2020 WL 6588615, at *1-2. The fact that both the IRS and IDOR were showing unfiled returns was an impediment to confirmation and should have been promptly addressed by

---

[14] The Trustee's time records also reflect that he did not reach out to other creditors until September 2021—nearly nine months into the case.

the Trustee. But the priority tax claimants were never going to vote for or against confirmation, not just because they usually do not vote for or against plan confirmation, but because they were not entitled to vote.[15] 11 U.S.C. §1123(a)(1). Further, the amount of the general unsecured claims held by the IRS and IDOR were always going to be dwarfed by the unsecured portions of the claims of the bank creditors—whether the IRS or IDOR voted their general unsecured claims was of little importance.

If Trustee Bourne advised Attorney Pioletti and the Debtor to forego consensual confirmation based on his belief that the IRS's affirmative vote would be necessary for consensual plan confirmation, he gave them wrong advice. Trustee Bourne claims time for reviewing the initial plan, but that plan said on its face that, pursuant to §1123(a)(1), priority tax claims would not be classified. The plan went on then to classify and impair those same claims. Trustee Bourne should have at least noticed that inconsistency and looked into the required treatment of priority tax claims in Chapter 11 cases. If he had done some research, he would have seen the error in his initial advice.

Trustee Bourne admits that, after amended claims were filed by both the IRS and IDOR, he knew consensual confirmation was in reach. But he still took no action to achieve that result. He prepared an order confirming the initial plan by agreement that would have sacrificed all potential benefits to the

---

[15] Trustee Bourne correctly cites a prior decision from this Court for the proposition that the IRS generally does not vote on plans. *See In re Sabbun*, 556 B.R. 383, 390 (Bankr. C.D. Ill. 2016) (citing Internal Revenue Manual 5.17.10.9.3. https://www.irs.gov/irm/part5/irm_05-017-010 (last visited June 3, 2022)). Importantly, however, *Sabbun* did not deal with the treatment of priority tax claims and therefore provides no guidance on those issues here. Rather, *Sabbun* involved the IRS as holder of a large general unsecured claim and dealt with its failure to vote in that capacity, which resulted in no impaired classes voting in favor of the plan and prevented confirmation.

Debtor of consensual confirmation and would have kept Trustee Bourne in the case for five years. In his narrative, Trustee Bourne queries whether he had a duty to oppose confirmation of the Debtor's initial plan once he realized a consensual confirmation was achievable. The answer to his query is that he had an absolute duty to work with the Debtor, Attorney Pioletti, and the creditors to try to achieve consensual confirmation of a plan, and at no point during the case was he relieved of that duty. The benefits to the Debtor of consensual confirmation were significant, and it is hard to imagine that the Debtor could have understood those benefits and willingly waived them. Even if Trustee Bourne charged only an hour each month of the five-year plan to account for and process payments, a minimum of $15,000 in additional fees would have been incurred over the term. An hour or two of fees per month may not seem like much to Trustee Bourne, but, for the Debtor with serious health problems and supporting himself in part with Go Fund Me donations, avoiding this additional cost alone more than justified starting over and obtaining consensual confirmation.

Again, the purpose of Subchapter V is to streamline the Chapter 11 process and make relief more accessible and cost-effective for small business debtors. *See MCM Natural Stone*, 2022 WL 1074065, at *1 (citations omitted). Racking up professional fees to be paid from the estate at the expense of other claimants and to the Debtor's detriment is at odds with that purpose. There will, of course, be cases that require the Subchapter V trustee to take on a more traditional trustee role when a debtor is removed as debtor in possession

or there is cause for the trustee to investigate the debtor's financial affairs. *See* 11 U.S.C. §§1183(b)(2) and (5), 1185. But this was not such a case; rather, this was a case akin to a "save-the-house" Chapter 13 with a few additional wrinkles regarding the Debtor's business interests and related debts that could have been resolved much more quickly.

To be sure, it was not Trustee Bourne's duty to babysit the Debtor and serve as his de facto co-counsel. But the Trustee incurred considerable fees for a lot of nonsubstantive work. Shadowing the Debtor's attorney and the UST's attorney is not helpful or necessary and should not be compensable. Even with the appointment of a Subchapter V trustee, debtors remain in possession and in control of their own cases. As the statute requires, Trustee Bourne did review claims and other filings in the case, appear and participate at hearings, account for estate property, respond to informational requests, and make objections as he deemed appropriate. And he is entitled to compensation for executing those duties. But he wholly failed at his principal duty, and that is hard to overlook.

In the two months between his appointment and the initial case status conference at which he expressed no concern about the progress being made in the case, Trustee Bourne had already incurred more than $3500 in fees. A good portion of those fees related to familiarizing himself with the case and attending necessary creditor meetings and initial Debtor interview. By the time he had filed his first interim fee application on June 2, 2021, however, that total had grown to more than $6000 despite a wholesale lack of effort on a

consensual plan and still no indication that the Debtor would even be able to satisfy the requirements for cramdown confirmation. The trend continued in the months that followed. By the August hearing on plan confirmation at which the Debtor reported that the IDOR claim objection still had not been resolved and the plan was still not ready to be confirmed, Trustee Bourne had incurred $8475 in fees, none of which—save for $100 charged to email the tax claimants about whether they would vote on confirmation—related to facilitating a consensual plan. Over the remaining months of the case, Trustee Bourne racked up significant fees helping the Debtor draft an amended plan, soliciting ballots in favor of the plan even though all creditors had already agreed to the plan terms, drafting confirmation orders, and following up with the Debtor on his statutory obligations.[16]

If $13,000 or even $10,000 in trustee fees becomes routine in uncomplicated Subchapter V cases, what amount of fees would be expected in more complicated cases where there is a need for more substantive trustee work? The answer is an amount that would make relief under Subchapter V unavailable to many small business debtors even though it is meant to be more cost-effective and accessible than traditional Chapter 11 relief. If careful

---

[16] The time spent drafting confirmation orders is somewhat confounding. After the Court said it would confirm the original plan as filed pending resolution of the tax claim objections, Trustee Bourne spent 3 hours preparing and submitting an agreed confirmation order that included new terms that substantively altered the plan as filed, as well as findings that the Court had not made. He does not include charges for that time in his request now before the Court, but it was time spent all the same. And when the Debtor's amended plan was apparently ripe for confirmation but for a small discrepancy in amount of one claim that was to be addressed in a proposed order from Attorney Pioletti, Trustee Bourne spent 2.5 hours creating a proposed order that again included plan changes that went beyond what was discussed and authorized at hearing. When that proposed order was rejected, he then spent another 1.5 hours drafting and circulating a revised order. The result was $1000 charge to the estate for the Trustee to draft a straightforward confirmation order that he was not asked to prepare.

attention is not paid to the amount of professional fees accruing in small business cases, there will be fewer and fewer such cases in Central Illinois. The UST appoints the Subchapter V trustees and has a duty to review and, if appropriate, comment on or object to fee requests by such trustees.  28 U.S.C. §586(a)(3). Here, the UST offered no comments on Trustee Bourne's fee request or his serious lapse in not even attempting to fulfill his duty to try to facilitate a consensual plan. The Court's expectation is that, in future cases, the UST will at least comment on such fee requests as contemplated by statute.

Again, the role of the Subchapter V trustee should not be to push a debtor through his own bankruptcy case or to do the work a debtor's counsel is hired to do. But trustees cannot incur fees for giving bad advice or sitting back and watching a debtor stumble through Chapter 11. In the end, notwithstanding the initial lack of help from the Trustee, the Debtor here was able to confirm a consensual plan with a late effort by his own attorney and Trustee Bourne. Trustee Bourne has also agreed to limit his fees to $10,000—a reduction of more than $3000. For those reasons, and because there were no objections to the fees, Trustee Bourne's fee application will be approved in full and may be paid from the funds he holds from Debtor payments.

## IV.   Conclusion

A key goal of Subchapter V is to provide "distressed small business owners the opportunity to reorganize their businesses more quickly and at a lower cost and allowing creditors to get paid sooner." Clifford J. White III,

"Small Business Reorganization Act: Implementation and Trends," XL *ABI Journal* 1, 54 (Jan. 2021). To that end, '[i]mmediately following appointment in a case, subchapter V trustees begin their primary pre-confirmation task of facilitating the development of consensual reorganization[.]" *Id.* Initial data compiled after almost one full year of Subchapter V filings suggested that, around the country, the goal was being met. Indeed, plan confirmations were generally achieved within about six months of case filings, 59% of which were reportedly consensual. Hon. Michelle M. Harner, Emily Lamasa and Kimberly Goodwin-Maigetter, "Subchapter V Cases by the Numbers," XL *ABI Journal* 10, 59 (Oct. 2021). Average trustee fees were running about $8200 with the "median award being $5033." *Id.*

Here, the Subchapter V Trustee apparently agreed with the Debtor's attorney to forego any efforts at obtaining consensual confirmation notwithstanding published guidance to the contrary from the UST Program. Whether the decision was made due to lack of willingness to put in the effort or because of an incorrect belief that the affirmative vote of the IRS on plan confirmation would be required, the failure to even try to obtain consensual confirmation cannot be justified. The UST never raised the issue with the Court and never questioned the decision at any hearing. This resulted in a fairly simple case taking a year to reach confirmation while the Trustee incurred fees significantly higher than the reported national averages. Yet the UST still did not weigh in even to comment or to assure the Court that the published guidance from the Executive Office of the UST is understood and will be

followed in future cases. What occurred in this case cannot happen again; the Court expects the UST to step up training and monitoring of Subchapter V cases and trustees to achieve the goals the statute was enacted to achieve.

Notwithstanding the Court's reservations, the fee applications will be approved.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###